IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff | | |
| v. | : | CRIM.  NO. 22-CR-98-4-JMY |
| | | |
| CHARLES O'BANNON, | : | |
| Defendant | : | |

**DEFENDANT'S REQUEST FOR DOWNWARD VARIANCE
AND SENTENCING MEMORANDUM**

**I.**    Introduction

"I am sorry for my involvement in this crime.  This is not who I am.  I didn't think beyond trying to make some extra money to help keep my family afloat and to have a little in preparation for the arrival of my daughter.  I really messed up everything.  I regret my behavior, and I am so ashamed." These are the words that Charles often uses when he discusses his criminal behavior and participation in the instant matter.

When approached by his childhood friend, Frederick Norman, about purchasing weapons for him, Charles was awaiting the birth of his daughter, Amanda, in November 2020, and he and his immediate family were struggling to make ends meet during the pandemic.  He had been thinking about how he suffered as a child after his parents separated when he was about nine years old.  He was thinking about how his father was never there for him, financially or emotionally.  (See Exhibit A,

Mitigation Report and Attachment[1]) He wanted to continue helping his family. Equally important, Charles wanted to do better for his child than his father did for him and his siblings. He did not wish his daughter Autumn to experience the financial hardships and lack of fatherly love and support he experienced after his parents separated. Charles realizes now that he chose the wrong path to get additional money to assist with her support. He realizes that his desire to help his family and to build a nest egg to cover some of the financial needs of his child once she was born is no excuse for his criminality.

Charles made a terrible decision, getting involved in the instant offense. He severely regrets his criminal actions and has sought only to improve himself and enhance his daughter's life and well-being through hard work and legal means. Since November 2020, Charles has been employed full-time at the Racetrac Company in Lithia Springs, Georgia. (PSR ¶ 109) He started as a cashier but has received three promotions and now serves as the Food and Beverage Manager at his location. He works an average of 50 hours a week; provides financial support to his daughter, Autumn, and shares her custody with her mother; broke his addiction to marijuana; is enrolled at Georgia State University, seeking an associate degree in business; and is a member of his New Bethesda Christian Ministries church. Based upon his

---

[1] Exhibit A, Sentencing Mitigation Report and Attachment, October 26, 2023, of Mitigation Specialist, Meg Miles, are incorporated herein. The Report and Attachment are being filed under seal because it contains medical information regarding the defendant and several members of his family.

efforts at post-offense rehabilitation, breaking his use of, and/or addiction to, marijuana, his traumatic childhood experiences, and his youthfulness at the time of the offense, Charles respectfully asks this Court to grant a variance from the sentencing guidelines. The PSR in Paragraph 133 notes that such factors may warrant a variance.

## II. Procedural History, Factual & Personal Background

### A. Procedural History

On March 17, 2022, a federal grand jury indicted Charles and ten others with conspiracy to engage in the business of dealing firearms without a license, in violation of 18 U.S.C. §§ 371, 922(a)(1)(A), 924(a)(1)(D) and 2. On October 11, 2022, Charles appeared before this Court and pleaded guilty to Count 1 of the Indictment. Sentencing is scheduled for November 14, 2023.

### B. Factual Background

Frederick Norman initially approached Charles about purchasing guns for him several months before Charles began buying weapons. Norman knew that Charles and his ex-girlfriend were expecting the birth of a child in the fall and that Charles was looking to earn some extra cash to pay expenses associated with the advent of his child. To get him interested, Norman first told Charles that it was legal to buy guns, which, for a short time, Charles believed. However, soon after he started buying the firearms for Norman, Charles learned that what he was doing was illegal.

Still, he continued to purchase the guns because he wanted to earn some extra cash to cover the expenses associated with his child's arrival and pay the mounting bills in his mother's household. He wanted to continue being "the man of the house" during the pandemic, as he had always tried to be since his father's abandonment. (Exhibit A, pp. 6-8)

Even as he got involved in the instant criminal case, Charles sought opportunities to step away from this negative part of his life and look for a way to handle his responsibilities to his soon-arriving child legitimately. Around early to mid-November 2020, Charles got a job with RaceTrac, a company that runs a chain of gas and convenience stores nationwide. Charles recognized that he could have a future with the company. He bought his last gun on November 11, 2020.

On April 7, 2021, ATF agents approached Charles about his involvement with Frederick Norman's scheme. And he fully confessed to them. By then, Charles' future was beginning to look bright – he had started to turn the corner on his short-lived foray into the criminal world. He had started back on the path of doing the right thing.

C.    Personal History

During his involvement in the instant offense, Charles was 22 years old and had never been in trouble before, not as a juvenile or an older teenager. He is now 25 years old. In August 2020, the country was in the throes of the COVID-19 pandemic.

4

Charles was desperate to continue his family's financial support and plan for the expenses associated with his daughter's expected birth. While Charles was reluctant to get involved with Norman's scheme initially, he decided to because Norman told him that what he would be doing, buying guns for Norman to resell, was not illegal and because of his desire to ease his financial desperation. Unfortunately, Charlse failed to stop and disengage from Mr. Norman's operation after it became clear that what he was doing was illegal because he was trying to keep his family afloat. (Exhibit A, pp. 9-11) However, he eventually stopped when his employment became more stable.

Charles's parents separated when he was nine, and he grew up with his mother and two sisters. After the separation, "it was hard… we had a tough time…." and "the family struggled financially." (PSR, ¶¶ 88, 90-91) There were far worse things that Charles experienced from his parents' relationship and his own with his father, including witnessing his father's physical and emotional abuse of his mother, as well as enduring abusive corporal punishment and mistreatment by his father. (See Exhibit A) His father's absence and lack of support, financially and otherwise, made Charles develop the urgent and consuming mission to help support his family, including his expected daughter, and to be a solid presence in her life. He has been the polar opposite of his father in how he cares for and supports his child.

Charles, in the summer of 2020, initially shouldered his financial obligations to his family and child, in part, by relying upon monies received from Mr. Norman for the guns he purchased on his behalf. (Exhibit A, pp. 9-10) Charles, who worked[2] from his early high school years to now, continually sought better-paying jobs to uplift himself and his family and later to support Autumn financially. As a result of his determination and desire to improve his life, Charles found a position with RaceTrac in November 2019. He started as a cashier, being paid $9.00 an hour, and, over the next several years, rose to his present salary of $17.00 an hour. Due to his hard work and diligence as an employee, he was promoted to his current Food and Beverage Manager position in about three years. Presently, he is being trained for a General Manager position and will run his own store.

Since Autumn was born, Charles has built a solid support base and developed a strong bond with her. Starting with her birth, he would fly back and forth to Washington, D.C.,  where she resides, about every two weeks and spend several days with her. Then, from around six months old through the present, he would bring her back to his home in Georgia for about one to two weeks and then return her to her mother's home in Washington. (Exhibit A, p. 11) Charles has been an attentive, caring, and loving father to her. He desires to give her all the love and

---

[2] Before he reached the age of 16 and could legally be employed in Georgia, Charles earned money by doing yard work for many in his neighborhood.

support he did not receive from his father as a child. (As an adult, Charles has somewhat developed a relationship with his father, generally the two texting each other.)

Charles has matured significantly since the commission of this offense. Moreover, he has strong community support, including the full support and love of his family, his church's help, and his employer's continued support. (Exhibit A & Attachment) This Court has received letters from Jakita O'Bannon, his mother; Chelsea O'Bannon, his twin sister; and Carmen Tucker, his ex-girlfriend and co-parent of Autumn. (Collectively, Exhibit B[3]) They represent solid familial, community, and professional support that will keep Charles firmly in the non-criminal life he led before involvement in the instant matter. They are all pillars that assure his continued and total rehabilitation.

### III. Sentencing Guidelines

The sentencing guidelines recommend a sentencing range of 46-57 months incarceration based upon a Total Offense Level of 23 and Criminal History Category I (based upon zero criminal history points because this was his first involvement with the criminal justice system).

---

[3] The letters from Jakita and Chelsea O'Bannon are redacted due to the inclusion of medical information. Unredacted copies will be provided to the Court and the government.

## IV.    Discussion

This Court should grant a significant variance below the sentencing guideline. Charles is a youthful, first-time offender who has worked hard at self-rehabilitation even before his confession to ATF agents who interviewed him in April 2021. He has significantly matured, pulled himself off the daily use and reliance upon marijuana, and embarked on a promising career in management for the RaceTrac Company.

As this Court knows, sentencing courts must "consider the widest possible breadth of information about a defendant" to ensure individualized sentencing. *Pepper v. United States*, 131 S.Ct. 1229 (2011). Thus, a sentencing court must, in every case: (1) calculate the defendant's guideline sentence; (2) rule on any departure motions; and (3) set the sentence by considering the sentencing factors described in 18 U.S.C. §3553(a) regardless of whether that sentence varies from the guideline sentence. *United States v. Arrelucea-Zamu*dio, 581 F.3d 142, 146 (3d Cir. 2009). *See also*, *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (*citing*, *Gall v. United States*, 552 U.S. 38, 50 (2007) ("In the wake of Booker, it is essential that district courts make an "individualized assessment based on the facts presented.")) The only correct sentence is the lowest sentence sufficient to satisfy the purposes of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); 18 U.S.C §3553(a) (parsimony provision). The sentencing court may not treat a guideline

sentence as inherently superior, or as one that is more reasonable than a non-guideline sentence. See, e.g., *Nelson v. United States*, 55 U.S. 350, 351 (2009) ("the guidelines are not only not mandatory in the sentencing court; they are not to be presumed reasonable"); *See also, Gall supra* at 50.

In determining a sufficient sentence, §3553(a) directs the sentencing court to consider the following factors:

(1)    The nature and circumstances of the offenses and the history and characteristics of the defendants. See 18 U.S.C. §3553(a)(1);

(2)    The kinds of sentences available. See 18 U.S.C. §3553(a)(3);

(3)    The need to avoid unwarranted sentencing disparities amongst defendants with similar records who have been found guilty of similar conduct. See 18 U.S.C. §3553(a)(6); and

(4)    The need to provide restitution to the victims of the offense. See 18 U.S.C. §3553(a)(7).

18 U.S.C. §3553(a). This is not an exhaustive list of factors.   Indeed, according to 18 U.S.C. §3661, "no limitation should be placed on the information concerning the background and character and conduct of the defendant which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence." Thus, a below guidelines sentence does not have to be justified by "extraordinary" circumstances and is not governed by any "rigid mathematical formula." *Gall*, *supra* at 47. Put differently, the Guidelines are just "the starting

point" for the Court to consider, along with all the USSG § 3553(a) factors. *Id* at 49.

A.    Youthfulness and Incomplete Development of a Mature Brain

When Charles got involved in the offense and bought the first gun on August 5, 2019, he had only turned 22 three days earlier. As such, his brain was still developing, and he was and is considered a youthful offender.

In recognition of the neuroscience of brain development, the United States Sentencing Commission (the Commission) in 2017, expanded its definition of "youthful offenders" to include "persons aged 25 or younger at the time they are sentenced in the federal system." Youthful Offenders in the Federal System, Fiscal Years 2010 to 2017, May 2017, PI, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf. In reaching these decisions, the Commission recognized recent studies on brain development and age, and Supreme Court decisions noting differences in offender culpability due to age, have led some policymakers to reconsider how youthful offenders should be punished. *Id.*, pp. 1 and 7. In particular, the Commission acknowledges that:

> First, researchers agree that the prefrontal cortex is not complete by the age of 18, which is the legal age of majority in most state jurisdictions and in the federal system. Second, researchers agree that development continues into the 20s. Third, most

> researchers reference 25 as the average age at which full development has taken place but note there will be significant variation from person to person.

*Id* at 7 (citations omitted). *See also*, Maturation of the Adolescent Brain, M. Arain *et al*., found at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/. See also Tirza A. Mullin, Eighteen Is Not A Magic Number: Why the Eighth Amendment Requires Protection for Youth Aged Eighteen to Twenty-Five, 53 U. Mich. J.L. Reform 807, 812 (2020) ("The prefrontal cortex is essential for both impulse control and decision-making in complex or high-stress situations and '[t]he fact remains that young people between the ages of eighteen and twenty-five do not have fully developed capacity to control impulses and make rational choices.'" (quoting David Pimentel, The Widening Maturity Gap: Trying and Punishing Juveniles As Adults in an Era of Extended Adolescence, 46 Tex. Tech. L. Rev. 71, 84 (2013)). The brain science supports Charles' request for a downward variance based upon his youthfulness at the time of the offense and incomplete brain development, which caused him to temporarily stray from the path of a law-abiding citizen for all his life, save for the four months he was involved with Frederick Norman's scheme.

B.    Impact of Childhood Trauma and Charles' Obsession to Financially Support His Family

"It requires no citation of authority to assert that children who are abused in their youth generally face extraordinary problems developing into responsible, productive citizens." *Santosky v. Kramer*, 455 U.S. 745, 789 (1982) (Rehnquist, J.,

11

joined by Burger, C.J., White, and O'Connor, J., dissenting); *United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999) ("It seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions . . . in extraordinary circumstances . . . district courts may properly grant a downward departure on the ground that extreme childhood abuse caused mental and emotional conditions that contributed to the defendant's commission of the offense.") Variance is proper because "defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).

It is clear but unfortunate that Charles' traumatic experiences resulting from his father's actions – abandonment and abusiveness – negatively impacted him in many ways and caused Charles to be hyper-determined to support his family and household.  It is likely that, but for his experiences with his father, Charles may not have felt the heightened desperation and despair that led him to make the wrong decision to help his family survive the economic difficulties of the COVID-19 pandemic by joining Frederick Norman's illegal scheme.

C.    Self-Rehabilitation

There is simply no way a lengthy period of incarceration is necessary to deter Charles from ever doing this, or anything like this, again.    He is an actual first offender, with no other arrest, charge, or conviction as an adult or juvenile.    "There is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I. Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism." *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (internal citations omitted).    Further, in light of his life history – feeling the need at an early age to "step up and be the man of the house" after his father left them; self-motivated kicking of his marijuana use; extensive work history dating back to high school and before; his current employment with RaceTrac and meteoric rise to Food and Beverage Manager, as well as pending promotion to General Manager for his location; and his co-parenting of, commitment and support to, and strong bond with his soon-to-be three-year-old daughter, Autumn – there is almost no chance he will risk all these good things and opportunities and re-offend. Deterrence and rehabilitation have been achieved.

**V.    Conclusion**

There is no reason to remove Charles from society for an extensive period. Charles is asking this Court for a second chance.    He is asking for an opportunity to

continue the progress made at turning his life around and resuming his law-abiding life before the aberrant four months he was involved in this offense.

Charles is asking this Court to recognize and consider the human frailties and traumatic experiences that got him involved in the instant crime.  He is asking this Court to consider that, unlike his father and many young men who have children, he is committed to giving his daughter all the love and support he can and to always being there for her.  He is asking further that the Court allow him to seize these opportunities to propel his efforts of self-rehabilitation into a triumphant story of the redemption and rehabilitation of a young Black man, now and always labeled a felon.

Mercy should be bestowed on Charles because he has entirely accepted responsibility, redeemed himself, and done everything possible to demonstrate his remorse and commitment to returning to a law-abiding life.  Charles is doing everything society expects from its members: working hard; participating in and gaining religious enlightenment; maintaining and excelling in his employment; taking care of his loved ones; and being an outstanding father and co-parent to his daughter Autumn.

Charles realizes that he stands on the precipice of losing everything, including being separated from his family and daughter.  Therefore, he is unlikely ever to re-

offend because being available and around to support them is not something he will ever again jeopardize.

Respectfully submitted,

Edson A. Bostic, Esquire
The Bostic Law Firm
1700 Market Street, Suite 1005
Philadelphia, PA 19103
Eab.bosticfirm@gmail.com

October 31, 2023                    Attorney for Charles O'Bannon

15

# SUPPORT LETTERS



Your Honor,

     I am Charles O'Bannon's mother.  Charles is a very hard working, give you his last dime, ambitious and dedicated individual. I raised my kids to be God Fearing family-oriented people. He has always been dedicated to the people close to him, loyal to family and I believe that was also his downfall, being loyal and trusting to the wrong people. Charles has never been the type of person that needed constant guidance to get on track - he was always responsible; my rock and I know I can depend and count on him. He's never been the person to get in trouble or constantly do something after he knew it was wrong and we would speak about it. As a child Charles was never in trouble - he knew what I expected of him and always exceeded those expectations. Charles always grew up in the church. He has a grandmother that always was heavy in the church and made sure she taught them the Bible and an aunt that is a Minister. When we moved to Georgia, we found a church home with our Pastor that lives right next door and became friends with a lot of individuals that's knew God and had the same morals I wanted him to have. Charles sees something and he will work hard to get it.

     At a young age, I moved my kids to Georgia to what I believed would be a better situation and environment for my kids - not realizing our family life would change and my marriage would fail because of this. The loss of his father, and disappointment in the situation, things said, and embarrassment caused Charles to change a lot in a short period of time. He developed ▇▇▇▇ which I believe he's had from a young age, and it showed in was I didn't realize like him being very clingy to me. When my husband left us, he left us in a situation where I wasn't working and struggled to stay afloat for my children. I as a parent tried to shield my children of this but in hindsight then knew and saw a lot of things. As hard as it was, from the time he could my son had a job. He worked so much, while in school to help me as much as he could. When he graduated and went to college - he would give me his refund checks because he knew I needed help without me even having to ask. A year ago, his twin sister had surgery - he made sure I had money to go be with her and gas in his car so I could get there and back. That is son I raised - a son that would give his last to the people he cares about. There have been multiple times I've seen him give to the homeless and our community. Around the time this incident occurred, I was really struggling. My daughter and I both lost our jobs due to Covid and waited months and months for unemployment to get approved, and my oldest daughter moved out - so we lost 3 incomes-and this was detrimental to our household.

     I believe the wrong opportunity presented itself at time where we all were desperate - facing this loss of our home in foreclosure and not knowing where to go. I firmly believe if we were not in such a situation, and my son didn't feel such a strong responsibility to help me - he would have never done this. My son is someone I fully depend on. He also has his daughter, my granddaughter Autumn. My son is an amazing father, and watching him with not only Autumn, but his ▇▇▇▇ nephew Jace is one of my greatest pleasures. He took this situation and horrible relationship he has with his absent father and makes sure he's present emotionally, physically and financially for both of them. It broke him to see his older sister struggle caring for a child with special needed by herself and supports her as much as he can - financially, taking him to appointments, therapies, and being an active person in Jace's life because he knows what it's like to not have a father around.

     Taking him away would cause the same hurt to Autumn and Jace - removing the stability they have come to expect and crave in their lives. My son is someone I need and depend on. He helps me to maintain and keep things afloat - especially with me being ▇▇▇▇, having grand mail seizures, also being diagnosed with ▇▇▇▇. When he came to me and talked to me about this situation - he thought he could believe and trust someone he knew and seen as a brother/close friend when he was told he wouldn't be doing anything wrong.  His first reaction was how this was going to affect his daughter, and his family.

     I know my son has learned from this situation and the guidance from his Pastor, his uncle, me and Mr. Church he will get everything he need. I'm asking to please give my son a second chance and not confine him in an institution. He has a vibrant future that he has set in place, and I know he will not make a turn into another situation.

Jakita
(313) 477-5533

Your Honor,

My twin brother has always been dedicated and loyal to those he cares about. He's always been committed to being the best brother, son, father and friend which in my opinion is due to our childhood. He's always wanted better for all of us and most importantly stability. Growing up we quickly went from a stable two parent home, to just having our mom struggle to do everything by herself. At a young age we left our support system and home in Michigan to what my mom thought what a better life in Georgia would be. Of course - we moved to a better and bigger home, but still had our challenges of leaving family we used to see daily to just us. Shortly after we moved our parent struggled with finding jobs which cause a big family strain, our paternal grandfather passed, and our father left us in debt, behind bills, and a home in foreclosure due to his irresponsibility with money. This when I noticed a shift in him with his █████ from the things he has seen our mother go through. Our mother being the women she is worked hard and prevents us losing our home - but this was a constant struggle we continued to deal with. We saw this and, in my opinion, it put an imaginary pressure on us to work and help as much as we could. As my mother's only son, my brother took this burden on a lot. From the time he could work - he's always had a job and worked to help as much as he could and even when he didn't while we started college together - he would give his entire refund checks to our mother to help as much as he could.

Charles has always been a protector and provider for his family. When our sister got pregnant at 18 - he stepped up to help her and be a father figure to our nephew who has no other father figures. When he was diagnosed with Autism, he was the first to want to know what the action plan was and how he could help, taking him to appointments, and therapies he needs every day of the week, and being a support system for our sister who is a single mom. Even though his daughter lives in a different state - he continues to play an active parenting role, providing money whenever needed, flying to and from to make sure he can spend time with her and be physically present. He continues to impress me by taking the negative from our childhood like our absent father and working to change that for his daughter and our nephew. Our mother - who struggle from ████████████████████, and financially depends on our brother. Wherever there is shortfall - he is there to help and make sure things do not go astray.

I know without a doubt my brother was disappointed in himself and takes full responsibility for the actions he has done but I would the court to understand the positions he and our family was in during this time. At the beginning of 2020, both my mother and I lost our jobs due to Covid. With the world going through the same thing, everything shutting down, no places hiring, and unemployment take 3-6 month just for initial reviews of claims, we fell extremely behind on bills - along with other severe home issues like our water heater breaking and basement flooding. Personally, he was always trying to prepare for the birth of his daughter. Our home was again going up for foreclosure with a for sale date of December and then pushed to January of 2021. As a family we had exhausted all our options and was just preparing for our last holiday at our home of 10 plus years. I believe my brother had the unfortunate wrong opportunity presented to him. It just sounded like a quick way to make our problems go away - which in turn created more problems.

My brother is a man of character and strength who time and time again proved to be a dependable family man that used the unfortunate mean to try and make sure his family would be okay. He is a hard worker, intelligent, and God-fearing individual that's has learned to further lean on and trust that God will always provide away. We grew up in the Church and my brother has done a lot to help our Church community. He works so hard, and I know undoubtedly has learned his lesson and take this situation to learn and grow as a person. If he was to be incarcerated - this would be a devastation to our family, the role he plays in my life, our family's life and most importantly his daughter life who is his reason for all he does. I believe in our judicial system being restorative and I believe this entire situation

has been that for him. I have seen so many positive changes in him, I have seen him take the time to work on his past and childhood traumas while being the best father and person he can be. We all need him, and I hope this letter provides some clarity as to just how much.

Chelsea O'Bannon
(404) 492-4622

Greetings Your Honor,

I am writing this letter on behalf of my daughter's father, Charles O'Bannon. I met him during our first week of college in 2016. We developed a friendship that eventually grew into a romantic relationship in 2018. Charles and I welcomed our daughter into the world in 2020 and have grown to share a bond with her, despite our romantic split. I am a first-hand witness to the growth that Charles has exuded since becoming a father to our daughter. As I am not fully aware of the details of this case, I can say without a doubt that the young and immature guy that allegedly was a part of the accused group of individuals tied to this case has grown tremendously as a responsible father and person overall. Unfortunately, young impressionable people tend to choose the wrong associates and in doing so can get caught up in unintentional situations. I believe with all my heart that that's what happened to Charles. I have never felt unsafe, in danger or believed that he could ever harm anyone. I am begging you to please be lenient in your punishment of my child's father as he has a great future ahead of himself and I do not want a bad judgment or unfortunate trust of an associate to be the cause of the greatness that he can offer to society. He is a hardworking, educated, respectful and a good human being. Prior to having our daughter, Charles and I spent a lot of time dating, learning to cook, traveling, attending church services, and college events. Now that we are parents, Charles spends all of his time finishing college, working, and caring for our daughter. I do not believe that he is a threat to anybody. I believe this situation needed to occur for him to separate himself from the individuals who never had his best interest in mind, as I have warned him. Charles and I have had several conversations about what he wants for his future as a man and as a father and I truly believe he will make better choices once given a chance to do so. This situation has taken a heavy toll on him and I. Charles covers the majority of the financial responsibility for our daughter and I need him to continue to be able to do so. More importantly, our daughter adores him and enjoys spending time with him. I believe Charles should not be put into a system which is not at all designed to reform him but will destroy what he has built with our daughter, a system built to destroy families. I believe he can be reformed without serving time in a prison. If there is any way that you can have mercy on him and allow him to get some type of counseling to help him continue on the right path that he is on or admit him into a program where he can give back to the community in a constructive way. I really hope that this letter for Charles will help with the court's decision about his fate.

Carmen Tucker
amira.tucker@yahoo.com
(202) 981-1559